Aurelia S. BROWDER, and Susie McDonald, and Claudette Colvin, by Q. P. Colvin, next friend, and Mary Louise Smith, by Frank Smith, next friend, and others similarly situated, Plaintiffs,

v.

W. A. GAYLE, Clyde Sellers and Frank Parks, individually and as members of the Board of Commissioners of the City of Montgomery, Alabama, and Goodwyn J. Ruppenthal, individually and as Chief of Police of the City of Montgomery, Alabama, and The Montgomery City Lines, Inc., a Corporation, and James F. Blake, and Robert Cleere, and C. C. (Jack) Owen, Jimmy Hitchcock, and Sibyl Pool, as members of the Alabama Public Service Commission, Defendants.

No. 1147.

United States District Court
M. D. Alabama, N. D.
June 5, 1956.

Charles D. Langford, Fred D. Gray, Montgomery, Ala., and Robert L. Carter, New York City, for plaintiffs.

Walter J. Knabe, Drayton N. Hamilton, and Herman H. Hamilton, Jr., Montgomery, Ala., for defendants Gayle, Sellers, Parks, and Ruppenthal.

Robert Thrun, New York City, for defendants Blake, Cleere, and Montgomery City Lines.

John Patterson, William N. McQueen, Gordon Madison, William F. Black, Montgomery, Ala., for defendants Owen, Hitchcock and Pool.

Before RIVES, Circuit Judge, and LYNNE and JOHNSON, District Judges.

RIVES, Circuit Judge.

## Statement of the Case

The purpose of this action is to test the constitutionality of both the statutes of the State of Alabama[1] and the ordinances of the City of Montgomery[2] which require the segregation of the white and colored races on the motor buses of the Montgomery City Lines, Inc.,

1. Title 48, § 301(31a, b, c), Code of Alabama of 1940, as amended, which provide:

"§ 301(31a). Separate accommodations for white and colored races.—All passenger stations in this state operated by any motor transportation company shall have separate waiting rooms or space and separate ticket windows for the white and colored races, but such accommodations for the races shall be equal. All motor transportation companies or operators of vehicles carrying passengers for hire in this state, whether intrastate or interstate passengers, shall at all times provide equal but separate accommodations on each vehicle for the white and colored races. The conductor or agent of the motor transportation company in charge of any vehicle is authorized and required to assign each passenger to the division of the vehicle designated for the race to which the passenger belongs; and, if the passenger refuses to occupy the division to which he is assigned, the conductor or agent may refuse to carry the passenger on the vehicle; and, for such refusal, neither the conductor or agent of the motor transportation company nor the motor transportation company shall be liable in damages. Any motor transportation company or person violating the provisions of this section shall be guilty of a misdemeanor and, upon conviction, shall be fined not more than five hundred dollars for each offense; and each day's violation of this section shall constitute a separate offense.

"The provisions of this section shall be administered and enforced by the Alabama public service commission in the manner in which provisions of the Alabama Motor Carrier Act of 1939 are administered and enforced. (1945, p. 731, appvd. July 6, 1945.)

"§ 301(31b). Operators of passenger stations and carriers authorized to segregate white and colored races.—All passenger stations in this state operated by or for the use of any motor transportation company shall be authorized to provide separate waiting rooms, facilities, or space, or separate ticket windows, for the white and colored races but such accommodations for the races shall be equal. All motor transportation companies and operators of vehicles, carrying passengers for hire in this state, whether intrastate or interstate passengers, are authorized and empowered to provide separate accommodations on each vehicle for the white and colored races. Any officer or agent of such motor transportation company or operator, in charge of any vehicle, is authorized to assign or reassign each passenger or person to a division, section or seat on the vehicle designated by such company or operator, or by such officer or agent, for the race to which the passenger or person belongs; and if the passenger or person refuses to occupy the division, section or seat to which he is so assigned, such officer or agent may refuse further to carry the passenger on the vehicle. For such refusal neither the officer nor agent, nor the motor transportation company, nor operator, shall be liable in damages. (1947, p. 40, § 1, appvd. July 18, 1947.)

"§ 301(31c). Failure to comply with rules and regulations as to segregation of white and colored races.—It shall be unlawful for any person willfully to refuse or fail to comply with any reasonable rule, regulation, or directive of any operator of a passenger station in this state operated by or for the use of any such motor transportation company, or of any authorized officer or agent of such operator, providing separate waiting rooms, facilities, or space, or separate ticket windows, for white and colored races; or willfully to refuse or fail to comply with any reasonable assignment or reassignment by any officer or agent in charge of any vehicle of any such motor transportation company or of any operator of vehicles carrying passengers for hire, of any passenger or person to a division, section, or seat on such vehicle designated by such officer or agent for the race to which such passenger or person belongs; any person so refusing or failing to comply with any such reasonable rule, regulation, or assignment, as aforesaid, shall be guilty of a misdemeanor and upon conviction shall be fined not more than $500.00 for such offense. (1947, p. 40, § 2, appvd. July 18, 1947.)"

2. Section 10, Chapter 6, Code of the City of Montgomery, 1952, which provides:

"Every person operating a bus line in the city shall provide equal but separate accommodations for white people and negroes on his buses, by requiring the

a common carrier of passengers in said City and its police jurisdiction.

The plaintiffs are four Negro citizens who bring this action for themselves and on behalf of all other Negroes similarly situated.[3] The defendants are the members of the Board of Commissioners and the Chief of Police of the City of Montgomery, the members of the Alabama Public Service Commission, The Montgomery City Lines, Inc., and two of its employee drivers.

Each of the four named plaintiffs has either been required by a bus driver or by the police to comply with said segregation laws or has been arrested and fined for her refusal so to do. The plaintiffs, along with most other Negro citizens of the City of Montgomery, have since December 5, 1955, and up to the present time, refrained from making use of the transportation facilities provided by Montgomery City Lines, Inc. Plaintiffs and other Negroes desire and intend to resume the use of said buses if and when they can do so on a non-segregated basis without fear of arrest.

The members of the Board of Commissioners and the Chief of Police of the City of Montgomery in their answers to the complaint admit "that they seek to enforce the statutes of the State of Alabama and the ordinances of the City of Montgomery, Alabama", and further aver that "segregation of privately owned buses within cities within the State of Alabama is in accordance with the laws of the State of Alabama and the City of Montgomery."

The members of the Alabama Public Service Commission deny that they, in their official capacities as such members have any jurisdiction over, or have issued any orders relating to the separation of the races on buses operated wholly within the City of Montgomery and its police jurisdiction. On information and belief they allege that the members of the Board of Commissioners and the Chief of Police of said City "have sought to enforce by legal means constitutional and valid statutes and ordinances providing for separate but equal seating arrangements on buses operated in the City of Montgomery, Alabama, and its police jurisdiction".

The Montgomery City Lines, Inc., admits that it has operated, and pursuant to orders of a State Court, continues to operate "its buses as required by the Statutes and Ordinances set out in the Complaint requiring it to provide equal but separate accommodations for the white and colored races". Without dispute the evidence is to the effect that, other than being separate, such accommodations are equal.

The defendants, Blake and Cleere, admit they are employees of the Montgomery City Lines and drivers of its buses, that as such they have acted pursuant to orders of said Company which "has operated its buses on the basis of racial segregation as required by said statutes and ordinances". They deny that as drivers of said buses they are exercising the powers of police officers in the enforcement of said statutes and ordinances.

---

employees in charge thereof to assign passengers seats on the vehicles under their charge in such manner as to separate the white people from the negroes, where there are both white and negroes on the same car; provided, however, that negro nurses having in charge white children or sick or infirm white persons, may be assigned seats among white people.

"Nothing in this section shall be construed as prohibiting the operators of such bus lines from separating the races by means of separate vehicles if they see fit."

Section 11 of Chapter 6, Montgomery City Code of 1952, further provides:

"Any employee in charge of a bus operated in the city shall have the powers of a police officer of the city while in actual charge of any bus, for the purpose of carrying out the provisions of the preceding section, and it shall be unlawful for any passenger to refuse or fail to take a seat among those assigned to the race to which he belongs, at the request of any such employee in charge, if there is such a seat vacant."

3. Rule 23(a), Fed.Rules Civ.Proc. 28 U.S. C.A.

The complaint prays for the convening of a three-judge district court as provided by Title 28 of the United States Code, § 2284; for a declaratory judgment as to whether the enforcement of said statutes and ordinances abridges the privileges and immunities of plaintiffs as citizens of the United States, or deprives them of liberty without due process of law, or denies to them the equal protection of the laws, as secured by the Fourteenth Amendment to the Constitution of the United States,[4] and the rights and privileges secured to them by Title 42, United States Code, §§ 1981 and 1983.[5] The complaint further prays that the defendants be both temporarily and permanently enjoined from enforcing the statutes and ordinances claimed to be unconstitutional and in conflict with said Federal statutes.

### Federal Jurisdiction

Federal jurisdiction is invoked under Title 28, United States Code, §§ 1331 and 1343(3),[6] and under Title 42, United States Code, §§ 1981 and 1983, footnote 5, supra. We think that the validity of both the State statutes and the City ordinances is in question, but if only the City ordinances are involved, Federal jurisdiction would still exist because the Constitution and statutes of Alabama authorize the adoption of City ordinances "not inconsistent with the laws of the state," [7] and because the constitutional phrase "equal protection of the laws" refers to City ordinances adopted under State authority as well as to State statutes.[8]

4. Fourteenth Amendment, § 1:
 "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

5. "§ 1981. Equal rights under the law
 "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."
 "§ 1983. Civil action for deprivation of rights
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

6. "§ 1331. Federal question; amount in controversy
 "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States."
 "§ 1343. Civil rights
 "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 * * * * *
 "(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

7. Constitution of Alabama of 1901, § 89; Alabama Code of 1940, Title 37, § 455.

8. Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149; Cf. 42 U.S.C.A. § 1983; Carlson v. People of State of California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104; Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; North American Cold Storage Co. v. City of Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195; City of, El Paso v. Texas Cities Gas Co., 5 Cir., 100 F.2d 501.

### Jurisdiction of Three Judge District Court

A three-judge district court is required for the granting of "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State". 28 U.S.C.A. § 2281. According to the complaint and the answers, the separation of the races on the buses is required both by State statutes and by City ordinances. Admittedly, therefore, State statutes are involved. The defendants claim, however, that the statutes and ordinances are being enforced by municipal officers only, and not by "any officer of such State". 28 U.S.C.A. § 2281, supra.

If the members of the Alabama Public Service Commission are proper parties defendant, a matter to be hereinafter discussed, then it must be conceded that the objection to the jurisdiction of the three judge district court fails. Irrespective of the answer to that question, however, we think that the three judge district court has jurisdiction.

The State statutes, footnote 1, supra, vest in the defendant bus drivers the authority to enforce, and, notwithstanding their insistence to the contrary, we think that when so engaged the bus drivers clearly are officers of the State.

■ The City Commissioners have important duties to perform in connection with the enforcement, operation, and execution of State statutes. Under Alabama law, a municipal corporation "is essentially a public agency, a local unit of gov-ernment, invested with a portion of the sovereign power of the state, for the benefit of its inhabitants." Cooper v. Town of Valley Head, 212 Ala. 125, 101 So. 874, 875. The defendant Chief of Police has authority to make arrests for violations of State statutes, 1940 Code of Alabama, Title 15, § 152. The City Recorder in criminal cases has the power of an ex-officio justice of the peace. 1940 Code of Alabama, Title 37, § 585. All of the City officials admit in their answers that they are enforcing the State statutes. An official, though localized by his geographic activities and the mode of his selection, is performing a State function when he enforces a statute which "embodies a policy of state-wide concern".[9]

Very clearly, the three judge district court has jurisdiction.[10]

### Comity

■ The defendants, relying on Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002, insist that even if the Federal court has jurisdiction, it should, in its discretion as a court of equity, and for reasons of comity, decline to exercise such jurisdiction until the State courts have ruled on the construction and validity of the statutes and ordinances. The short answer is that doctrine has no application where the plaintiffs complain that they are being deprived of constitutional civil rights, for the protection of which the Federal courts have a responsibility as heavy as that which rests on the State courts.[11]

---

9. Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 680, 79 L.Ed. 1322; Rorick v. Board of Commissioners, 307 U.S. 208, 212, 59 S.Ct. 808, 83 L.Ed. 1242; City of Cleveland v. United States, 323 U.S. 329, 332, 65 S.Ct. 280, 89 L.Ed. 274; Watch Tower Bible & Tract Society v. City of Bristol, D.C.Conn., 24 F. Supp. 57, affirmed 305 U.S. 572, 59 S.Ct. 246, 83 L.Ed. 361; Suncrest Lumber Co. v. North Carolina Park Commission, 4 Cir., 29 F.2d 823.

10. If, however, the proceedings were not such as to require the presence of three judges, the judgment would still be valid as the act of the court of one judge, since that judge concurs and joins in the rendition of the judgment. Public Service Commission v. Brasher Freight Lines, Inc., 312 U.S. 621, 626, 61 S.Ct. 784, 85 L.Ed. 1083; O'Malley v. U. S., 8 Cir., 128 F.2d 676, 687.

11. Lane v. Wilson, 307 U.S. 268, 274, 59 S.Ct. 872, 83 L.Ed. 1281; Mitchell v. Wright, 5 Cir., 154 F.2d 924, 926; Romero v. Weakley, 9 Cir., 226 F.2d 399, 402; Wilson v. Beebe, D.C.Del., 99 F. Supp. 418, 420. Cf. Doud v. Hodge, 350 U.S. 485, 487, 76 S.Ct. 491.

#### Parties

█ Without repeating the averments of the complaint we hold that they are clearly sufficient to constitute this a class action on behalf of the four individual plaintiffs and of all other Negro citizens similarly situated. See Rule 23(a), F.R. C.P.

██ It was probably not necessary for the plaintiffs to sue the members of the Board of Commissioners and the Chief of Police, not only as such but also individually, when no relief is sought against them by way of damages. If, however, the plaintiffs' contentions are sustained, these defendants are acting not only in their capacities as municipal officers, but also as officers of the State; and, further, are possibly transcending the scope of their office in any capacity when they compel obedience to statutes and ordinances attacked as unconstitutional. Moreover, in issuing and enforcing an injunction, a court of equity acts in personam. If, as we trust will be true, no relief becomes necessary against any of them in their individual capacities, their joinder as individuals will prove harmless. The motion to strike said parties in their individual capacities is therefore denied.

█ The members of the Alabama Public Service Commission object to their joinder as parties defendant and move to dismiss the action as against them because they say that neither they nor the Commission have any jurisdiction over the buses which are being operated within the City of Montgomery and its police jurisdiction.[12]

In the Act approved July 6, 1945, General Acts of Alabama 1945, p. 731, now carried into the pocket supplement of the 1940 Code of Alabama as Title 48, § 301 (31a), see footnote 1, supra, appears the following significant paragraph: "The provisions of this section shall be administered and enforced by the Alabama public service commission in the manner in which provisions of the Alabama Motor Carrier Act of 1939 are administered and enforced."

Testifying as a witness, the President of the Alabama Public Service Commission admitted that on April 24, 1956, he sent a telegram to the National City Lines of Chicago, of which the Montgomery City Lines, Inc., is a subsidiary, reading as follows:

"As President of the Alabama Public Service Commission, elected by the people of Alabama, sworn to uphold the segregation laws of this state, which include all forms of public transportation, I hereby defy ruling handed down by the United States Supreme Court ordering desegregation on public carriers. Alabama state law requiring segregation of the races on buses still stands. All public carriers in Alabama are hereby directed to strictly adhere to all present existing segregation laws in our state or suffer the consequences.

"/s/ C. C. (Jack) Owen, President

Alabama Public Service"

That telegram was sent without the knowledge or concurrence of the other two Commissioners.

Since the 1945 Act expressly imposes on the Alabama Public Service Commission the duty of administering and enforcing its requirements as to segregation of the races, and since the President of the Commission has acted so positively and affirmatively to that end, the motion to dismiss the action as against the members of the Alabama Public Service Commission should be and the same is hereby denied.[13]

12. Compare Code of Alabama 1940, Title 48, § 239 with § 2 of the Alabama Motor Carrier Act of 1939 carried into the pocket supplement of the Alabama Code as Title 48, § 301(2).

13. If, in law and fact, the Commission has no jurisdiction over the operation of the buses here involved, the retention of the members of the Commission as parties defendant will be harmless to them, even if erroneous.

## Validity of Separate But Equal Doctrine as Applied to Intrastate Transportation

The ultimate question is whether the statutes and ordinances requiring the segregation of the white and colored races on the common carrier motor buses in the City of Montgomery and its police jurisdiction are unconstitutional and invalid. Unless prohibited by the Constitution of the United States, the power to require such segregation is reserved to the States or to the people.—See Tenth Amendment.

 In their private affairs, in the conduct of their private businesses, it is clear that the people themselves have the liberty to select their own associates and the persons with whom they will do business, unimpaired by the Fourteenth Amendment. The Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. Indeed, we think that such liberty is guaranteed by the due process clause of that Amendment.

 There is, however, a difference, a constitutional difference, between voluntary adherence to custom and the perpetuation and enforcement of that custom by law. Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161. The Fourteenth Amendment provides that "No State shall * * * deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

 Those provisions do not interfere with the police power of the States so long as the state laws operate alike upon all persons and property similarly situated. Barbier v. Connolly, 113 U.S. 27, 31, 32, 5 S.Ct. 357, 28 L.Ed. 923. That Amendment "merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." Marchant v. Pennsylvania Railroad Co., 153 U.S. 380, 390, 14 S.Ct. 894, 897, 38 L.Ed. 751. The equal protection clause requires equality of treatment before the law for all persons without regard to race or color. See e. g. Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664; Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149; Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161.

In Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, decided in 1896, the Supreme Court held as to intrastate commerce that a Louisiana statute, LSA–R.S. 45:528 et seq., requiring railway companies to provide equal but separate accommodations for the white and colored races was not in conflict with the provisions of the Fourteenth Amendment. That holding was repeatedly followed in later cases. Chesapeake & Ohio Ry. Co. v. Kentucky, 1900, 179 U.S. 388, 21 S.Ct. 101, 45 L.Ed. 244; Chiles v. Chesapeake & Ohio Ry. Co., 1910, 218 U.S. 71, 30 S.Ct. 667, 54 L.Ed. 936; McCabe v. Atchison, T. & S. F. Ry. Co., 1914, 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169.

In Morgan v. Virginia, 1946, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, the Court held that a state statute requiring segregated seats for Negro passengers on interstate buses was an unconstitutional burden of interstate commerce. In Henderson v. United States, 1950, 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302, the Court held that interstate railroad regulations and practices assigning a separate table in a dining car to Negroes contravened the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. The Court referred to the statutory right as "a fundamental right of equality of treatment," and cited cases construing the Fourteenth Amendment, see 339 U.S. 825, 70 S.Ct. 847, though the Court did not reach the constitutional question. The reasoning applied was similar to that employed in Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 92 L.Ed. 1161, where the Court recognized that the underlying philosophy of the Fourteenth Amendment is the equality before the law of each individual.

In the field of college education, beginning in 1938 and continuing to the pres-

ent time, the Court has first weakened the vitality of, and has then destroyed, the separate but equal concept. State of Missouri ex rel. Gaines v. Canada, 1938, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; Sipuel v. Board of Regents of University of Oklahoma, 1948, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; Fisher v. Hurst, 1948, 333 U.S. 147, 68 S.Ct. 389, 92 L.Ed. 604; Sweatt v. Painter, 1950, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; McLaurin v. Oklahoma State Regents, 1950, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149; State of Florida ex rel. Hawkins v. Board of Control of Florida, 1954, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112; Tureaud v. Board of Supervisors of Louisiana State University, 1954, 347 U.S. 971, 74 S.Ct. 784, 98 L.Ed. 1112; Lucy v. Adams, 1955, 350 U.S. 1, 76 S.Ct. 33; State of Florida ex rel. Hawkins v. Board of Control, 350 U.S. 413, 76 S.Ct. 464; Board of Trustees of University of North Carolina v. Frasier, 1956, 350 U.S. 979, 76 S.Ct. 467.

The separate but equal concept had its birth prior to the adoption of the Fourteenth Amendment in the decision of a Massachusetts State court relating to public schools. Roberts v. City of Boston, 1849, 5 Cush. 198, 59 Mass. 198. The doctrine of that case was followed in Plessy v. Ferguson, supra. In the School Segregation Cases, Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, the separate but equal doctrine was repudiated in the area where it first developed, i. e., in the field of public education. On the same day the Supreme Court made clear that its ruling was not limited to that field when it remanded "for consideration in the light of the Segregation Cases * * * and conditions that now prevail" a case involving the rights of Negroes to use the recreational facilities of city parks. Muir v. Louisville Park Theatrical Association, 1954, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112.

Later the Fourth Circuit expressly repudiated the separate but equal doctrine as applied to recreational centers. Dawson v. Mayor and City Council of Baltimore, 4 Cir., 220 F.2d 386, 387. Its judgment was affirmed by the Supreme Court, 350 U.S. 877, 76 S.Ct. 133. The doctrine has further been repudiated in holdings that the cities of Atlanta and of Miami cannot meet the test by furnishing the facilities of their municipal golf courses to Negroes on a segregated basis. Rice v. Arnold, 340 U.S. 848, 71 S.Ct. 77, 95 L.Ed. 621; Holmes v. City of Atlanta, 350 U.S. 879, 76 S.Ct. 141.

Even a statute can be repealed by implication. A fortiori, a judicial decision, which is simply evidence of the law and not the law itself, may be so impaired by later decisions as no longer to furnish any reliable evidence.[14]

---

14. This principle is aptly illustrated by the difference with which the Fourth Circuit treated Plessy v. Ferguson as a binding precedent in 1950, Boyer v. Garrett, 183 F.2d 582 and in 1955, Flemming v. South Carolina Electric & Gas Co., 224 F.2d 752. In their change of views that distinguished Court headed by Chief Judge Parker was governed by the rule best stated by Judge Parker himself, speaking for a three judge district court in Barnette v. West Virginia State Board of Education, D.C., 47 F.Supp. 251, 252–253:

"Ordinarily we would feel constrained to follow an unreversed decision of the Supreme Court of the United States, whether we agreed with it or not. It is true that decisions are but evidences of the law and not the law itself; but the decisions of the Supreme Court must be accepted by the lower courts as binding upon them if any orderly administration of justice is to be attained. The developments with respect to the Gobitis case [Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375] however, are such that we do not feel that it is incumbent upon us to accept it as binding authority. Of the seven justices now members of the Supreme Court who participated in that decision, four have given public expression to the view that it is unsound, the present Chief Justice in his dissenting opinion rendered therein and three other justices in a special dissenting opinion in Jones v. City of Opelika, 316 U.S. 584, 62 S.Ct. 1231, 1251, 86 L.Ed. 1691. The majority of the court in Jones v. City of Opelika, more-

We cannot in good conscience perform our duty as judges by blindly following the precedent of Plessy v. Ferguson, supra, when our study leaves us in complete agreement with the Fourth Circuit's opinion [15] in Flemming v. South Carolina Electric & Gas Co., 224 F.2d 752, appeal dismissed April 23, 1956, 351 U.S. 901, 76 S.Ct. 692, that the separate but equal doctrine can no longer be safely followed as a correct statement of the law. In fact, we think that Plessy v. Ferguson has been impliedly, though not explicitly, overruled, and that, under the later decisions, there is now no rational basis upon which the separate but equal doctrine can be validly applied to public carrier transportation within the City of Montgomery and its police jurisdiction. The application of that doctrine cannot be justified as a proper execution of the state police power.[16]

█ We hold that the statutes and ordinances requiring segregation of the white and colored races on the motor buses of a common carrier of passengers in the City of Montgomery and its police jurisdiction violate the due process and equal protection of the law clauses of the Fourteenth Amendment to the Constitution of the United States. This holding does not, however, become effective until the entry of formal judgment. The parties are requested to submit to the Court in writing within two weeks from the date of this opinion their views as to the form of judgment to be entered, and as to whether such judgment should be stayed in the event of an appeal.

LYNNE, District Judge (dissenting).

Only a profound, philosophical disagreement with the ultimate conclusion of the majority "that the separate but equal doctrine can no longer be safely followed as a correct statement of the law" would prompt this, my first dissent. But I should consider myself recreant both to conscience and duty in withhold-

---

over, thought it worth while to distinguish the decision in the Gobitis case, instead of relying upon it as supporting authority. Under such circumstances and believing, as we do, that the flag salute here required is violative of religious liberty when required of persons holding the religious views of plaintiffs, we feel that we would be recreant to our duty as judges, if through a blind following of a decision which the Supreme Court itself has thus impaired as an authority, we should deny protection to rights which we regard as among the most sacred of those protected by constitutional guaranties."

To like effect is the opinion of Judge Frank for the Second Circuit in Perkins v. Endicott Johnson Corporation, 128 F. 2d 208, 217–218:

"We would stultify ourselves and unnecessarily burden the Supreme Court if—adhering to the dogma, obviously fictional to any reader of its history, that alterations in that court's principles of decision never occur unless recorded in explicit statements that. earlier decisions are overruled—we stubbornly and literally followed decisions which have been, but not too ostentatiously, modified. 'The life of the law,' as Mr. Justice Holmes said, 'has been experience.' Legal doctrines, as first enunciated, often prove to be inadequate under the impact of en-

suing experience in their practical application. And when a lower court perceives a pronounced new doctrinal trend in Supreme Court decisions, it is its duty, cautiously to be sure, to follow not to resist it." See also United States v. Girouard, 1 Cir., 149 F.2d 760, 765, dissenting opinion of Judge Woodbury, reversed 328 U.S. 61, 66 S.Ct. 826, 90 L. Ed. 1084; New England Mutual Life Ins. Co. v. Welch, 1 Cir., 153 F.2d 260, 262; Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 636; opinion by Judge Learned Hand; Spector Motor Service v. Walsh, 2 Cir., 139 F.2d 809, 814, opinion by Circuit Judge Clark; Gardella v. Chandler, 2 Cir., 172 F.2d 402, 409; United States v. Ullmann, 2 Cir., 221 F.2d 760, 762; "The Attitude of Lower Courts to Changing Precedents", 50 Yale L.J. 1448.

15. That opinion is entitled to great respect, especially in view of the distinction and learning of the judges who compose that Court, Circuit Judges Parker, Soper and Dobie.

16. Shelley v. Kraemer, 334 U.S. 1, 21, 68 S.Ct. 836, 92 L.Ed. 1161; Morgan v. Virginia, 328 U.S. 373, 380, 66 S.Ct. 1050, 90 L.Ed. 1317; Buchanan v. Warley, 245 U.S. 60, 74, 38 S.Ct. 16, 62 L. Ed. 149; City of Birmingham v. Monk, 5 Cir., 185 F.2d 859, 862.

ing my views because of the affection and esteem which I bear for my associates.

For many years as a trial judge in the state and federal systems I have endeavored faithfully to understand and apply precedents established by the opinions of appellate courts. This was not a blind obedience to a legalistic formula embodied in the rule of stare decisis. It was the result of a simple belief that the laws which regulate the conduct, the affairs, and sometimes the emotions of our people should evidence not only the appearance but also the spirit of stability.

Judges of trial courts frequently find themselves in disagreement with the rationale of an old, but clearly controlling precedent. That is so because their positions do not insulate them from those changing physical and metaphysical concepts which form a part of the life process. But they are neither designed nor equipped to perform the legislative function of putting off the old and putting on the new. To arrogate to themselves this prerogative, in my humble opinion, would be the first, fatal step in making hollow the proud boast that ours is a "government of laws and not of men."

Judge Rives, just the other day, delivering the opinion of the Court of Appeals for the Fifth Circuit, sitting en banc, in Howard v. United States, 232 F.2d 274, 275, stated my position, clearly and concisely:

"In the face of such recognition by the Supreme Court of a test of criminal responsibility, we do not feel at liberty to consider and decide whether in our opinion the recent modification of such test in the District of Columbia is sound or unsound, nor whether some other test should be adopted. *This Circuit fol-*

*lows the law as stated by the Supreme Court and leaves any need for modification thereof to that Court.* \* \* \*." (Emphasis supplied.)

The majority recognize, it was conceded in oral arguments by counsel for plaintiffs, that Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, is precisely in point, and that its holding has been repeatedly followed in later transportation cases.[1] Its authority obviously was unaffected by the action of the Supreme Court in dismissing the appeal in South Carolina Electric & Gas Co. v. Flemming, 351 U.S. 901, 76 S.Ct. 692. The citation of Slaker v. O'Connor, 278 U.S. 188, 49 S.Ct. 158, 73 L.Ed. 258, is convincing that it did not place the stamp of its approval upon the decision of the Fourth Circuit in Flemming v. South Carolina Electric & Gas Co., 224 F.2d 752, but simply concluded that its judgment was not final and hence that the appeal did not lie. 28 U.S.C.A. § 1254(2).

In complete agreement with the Fourth Circuit's opinion in Flemming that the separate but equal doctrine can no longer be safely followed as a correct statement of the law, the majority conclude that Plessy v. Ferguson, in which that doctrine made its first appearance sixty years ago, has been impliedly, though not explicitly overruled. While I share their great respect for Judges Parker, Soper and Dobie, I do not at all agree.

A comparatively new principle of pernicious implications has found its way into our jurisprudence.[2] Lower courts may feel free to disregard the precise precedent of a Supreme Court opinion if they perceive a "pronounced new doctrinal trend" in its later decisions which would influence a cautious judge to prophesy that in due time and in a proper

1. Chesapeake & Ohio Ry. Co. v. Kentucky, 1900, 179 U.S. 388, 21 S.Ct. 101, 45 L.Ed. 244; Chiles v. Chesapeake & Ohio Ry. Co., 1910, 218 U.S. 71, 30 S.Ct. 667, 54 L.Ed. 936; McCabe v. Atchison, T & S. F. Ry. Co., 1914, 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169.

2. Barnette v. West Virginia State Board of Education, D.C.1942, 47 F.Supp. 251;

Perkins v. Endicott Johnson Corporation, 2 Cir., 1942, 128 F.2d 208; Spector Motor Service v. Walsh, 2 Cir., 1943, 139 F.2d 809; Gardella v. Chandler, 2 Cir., 1949, 172 F.2d 402, 409; United States v. Ullmann, 2 Cir., 1955, 221 F.2d 760; United States v. Girouard, 1 Cir., 1945, 149 F.2d 760; 50 Yale Law Journal 1448.

case such established precedent will be overturned explicitly. Peculiarly appropriate in this context is the following language of Judge Woodbury, writing for the First Circuit in New England Mutual Life Ins. Co. v. Welch, 153 F.2d 260, 262:

"Furthermore we find no indication from anything said therein of a purpose to depart from the rule of the earlier decisions cited above. Under these circumstances we see no occasion even to consider the basic question whether we would adopt the doctrine of Barnette v. West Virginia State Board of Education, D.C., 47 F.Supp. 251, 253, and Spector Motor Service v. Walsh, 2 Cir., 139 F.2d 809, 817, 823, and in extraordinary situations disregard controlling decisions of the Supreme Court not yet explicitly overruled. It will suffice to say that we would feel disposed to consider taking such a course only when there are the clearest indications that the controlling decision of the Supreme Court, though not formally overruled, would no longer be followed by that Court and we find no such indications here."

In 1950, the Fourth Circuit had before it the case of Boyer v. Garrett, 183 F.2d 582, involving an officially adopted rule providing for the segregation of races in athletic activities in the public parks and playgrounds in the City of Baltimore. In affirming the judgment of the District Court, the same judges who decided Flemming held:

"The contention of plaintiffs is that, notwithstanding this equality of treatment, the rule providing for segregation is violative of the provisions of the federal Constitution. The District Court dismissed the complaint on the authority of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; and the principal argument made on appeal is that the authority of Plessy v. Ferguson has been so weakened by subsequent decisions that we should no longer consider it as binding. We do not

think, however, that we are at liberty thus to disregard a decision of the Supreme Court which that court has not seen fit to overrule and which it expressly refrained from reexamining, although urged to do so, in the very recent case of Sweatt v. Painter, [339 U.S. 629] 70 S.Ct. 848 [94 L.Ed. 1114]. It is for the Supreme Court, not us, to overrule its decisions or to hold them outmoded."

In 1955, in Flemming, an intrastate transportation case, reversing the district judge, the court wrote:

"We do not think that the separate but equal doctrine of Plessy v. Ferguson, supra, can any longer be regarded as a correct statement of the law. That case recognizes segregation of the races by common carriers as being governed by the same principles as segregation in the public schools; and the recent decisions in Brown v. Board of Education [of Topeka], 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, which relate to public schools, leave no doubt that the separate but equal doctrine approved in Plessy v. Ferguson has been repudiated. That the principle applied in the school cases should be applied in cases involving transportation, appears quite clearly from the recent case of Henderson v. United States, 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302, where segregation in dining cars was held violative of a section of the interstate commerce act providing against discrimination."

Within this five year interval the Supreme Court had spoken pertinently but once, in the case of Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, since Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L. Ed. 884, did not discuss Plessy v. Ferguson and appears to have been decided on a parity of reasoning. My study of Brown has convinced me that it left unimpaired the " 'separate but equal' " [347 U.S. 483, 74 S.Ct. 688] doctrine in a

local transportation case and I perceive no pronounced new doctrinal trend therein.

Of course I appreciate the care with which the Supreme Court limits its pronouncements upon great constitutional questions to the narrow issues before it and the only issue in Brown involved a collision between the Fourteenth Amendment and state laws commanding segregation in the public schools. But in Brown the Court's opinion referred to Plessy v. Ferguson six times and to its " 'separate but equal' " doctrine on four occasions. It epitomized its concept of that doctrine as follows: "Under that doctrine, equality of treatment is accorded when the races are provided substantially equal facilities, even though these facilities be separate." Its ultimate conclusion was, and this I conceive to be the rationale of its decision, "that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal."

It seems to me that the Supreme Court therein recognized that there still remains an area within our constitutional scheme of state and federal governments wherein that doctrine may be applied even though its applications are always constitutionally suspect and for sixty years it may have been more honored in the breach than in the observance. Granted that the trend of its opinions is to the effect that segregation is not to be permitted in public facilities furnished by the state itself and the moneys of the state, as in the case of public schools, or public parks, cf. Muir v. Louisville Park Theatrical Association, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112; Dawson v. Mayor and City Council of Baltimore, 4 Cir., 220 F.2d 386, affirmed 350 U.S. 877, 76 S.Ct. 133, or municipal golf courses, cf. Rice v. Arnold, 340 U.S. 848, 71 S.Ct. 77, 95 L.Ed. 621; Holmes v. City of Atlanta, 350 U.S. 879, 76 S.Ct. 141, on the plain theory that if the state is going to provide such facilities at all, it must provide them equally to the citizens, it does not follow that it may not be permitted in public utilities holding nonexclusive franchises.

If that doctrine has any vitality, this is such a case in which it has been applied fairly. According to its teaching not absolute, but substantial equality is required. Such equality is not a question of dogma, but one of fact. Under the undisputed evidence adduced upon the hearing before us practices under the laws here attacked have resulted in providing the races not only substantially equal but in truth identical facilities.

In my opinion the holding of the Court in Morgan v. Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, that the attempt of a state to require the segregation of passengers on interstate buses results in the imposition of an undue burden on interstate commerce is wholly irrelevant to the issue before us. And equally inapposite is reference to Henderson v. United States, 339 U.S. 816, 70 S. Ct. 843, 844, 94 L.Ed. 1302 which held that rules and practices of interstate railroad carriers requiring the segregation of passengers in dining cars were offensive to Section 3(1) of the Interstate Commerce Act making it unlawful for a railroad in interstate commerce " 'to subject any particular person, * * * to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: * * * .' "

The supremacy of the federal government in matters affecting interstate commerce is axiomatic. Cases involving the exercise of its power in that realm shed no light on Fourteenth Amendment problems. It does seem quite clear that by its terms the Congress is given the power and duty to enforce the Fourteenth Amendment by legislation. Thus the Congress would have the power, thus derived, to proscribe segregation in intrastate transportation. It is worthy of note that for sixty years it has not seen fit to do so.

While any student of history knows that under our system of government vindication of the constitutional rights of the individual is not, and ought not to be, entrusted to the Congress, its ret-

icence to intrude upon the internal affairs of the several states should caution us against doing so where the path of duty is not plainly marked and when we must hold a clear precedent of the Supreme Court outmoded.

Because I would dismiss the action on the authority of Plessy v. Ferguson, I do not reach the procedural questions discussed in the majority opinion. I respectfully dissent.